Branch Banking and Trust Co. v. Lighthouse Fin. Corp., 2005 NCBC 3

STATE OF NORTH CAROLINA           IN THE GENERAL COURT OF JUSTICE
                                  SUPERIOR COURT DIVISION
FORSYTH COUNTY                               04 CVS 1523

| | |
|---|---|
| BRANCH BANKING AND TRUST COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| LIGHTHOUSE FINANCIAL CORP., | ) ) |
| Defendant. | ) |

## ORDER

{1}    This matter is before the Court on defendant's motion for leave to file a second amended answer and counterclaim, defendant's motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and plaintiff's motion to dismiss defendant's counterclaims pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. After considering the briefs and oral arguments of both parties and for the reasons below, the Court: 1) grants leave to file a second amended answer and counterclaim in part and denies leave in part; 2) denies defendant's motion to dismiss pursuant to Rule 12(b)(6); and 3) grants in part and denies in part plaintiff's motion to dismiss defendant's counterclaims pursuant to Rule 12(b)(6).

*Bell, Davis, and Pitt, P.A. by James R. Fox and D. Anderson Cameron for Plaintiff Branch Banking and Trust Company.*

*Tuggle Duggins & Meschan, P.A. by Robert C. Cone and David S. Meschan for Defendant Lighthouse Financial Corporation.*

## I.
## FACTUAL HISTORY

{2}    Plaintiff Branch Banking and Trust Company ("BB&T") is a banking corporation organized and existing under the laws of the State of North Carolina, with its principal office located in Forsyth County, North Carolina.

{3}    Defendant Lighthouse Financial Corporation ("Lighthouse") is an asset-based lender organized and existing under the laws of the State of North Carolina, with its principal office located in Guilford County, North Carolina.

{4}    The parties previously were involved in business transactions which were the basis of an adversary proceeding before the United States Bankruptcy Court for the Middle District of North Carolina, adversary proceeding number A-01-2016G (the "Adversary Proceeding").[1] The facts were ably presented in an opinion filed by the Bankruptcy Court on October 10, 2003.

Vendsouth, Inc. ("Vendsouth"), the Debtor, was a wholesale distributor of foods, primarily snack foods, for sale in vending machines. Vendsouth was wholly owned either by Terrance Arth or by Terrance and Judy Arth. Terrance Arth was President of Vendsouth and Judy Arth, Terrance Arth's wife, served as the company's Secretary. Mark Sylvester was the company's Controller. Terrance Arth, Judy Arth and Mark Sylvester were the officers of Vendsouth ("Vendsouth Officers").

On May 21, 1997, Vendsouth and Lighthouse Financial Corp. ("Lighthouse") entered into a Loan and Security Agreement and Vendsouth signed a Demand Promissory Note in the amount of $ 1,000,000.00. This loan was secured by the inventory and accounts receivable of Vendsouth. Vendsouth initially established bank accounts at Centura Bank. Thereafter, in February of 1998, Vendsouth established three bank accounts at BB&T. Only two of the accounts were involved in the transactions giving rise to this proceeding, these being account no. 5211437903 (the "Operating Account") and account no. 5211437881 (the "Blocked Account"). In establishing these accounts, BB&T, Vendsouth and Lighthouse entered into an agreement entitled "Agreement Relating to Deposit Account" which related to the Blocked Account (the "Blocked Account Agreement"). The Blocked Account was to be used by Vendsouth to deposit the collections from its accounts receivable. Vendsouth was to inform Lighthouse of the amount of the deposits made into the Blocked Account. Lighthouse was then authorized to withdraw the deposits daily by a check drawn on the Blocked Account. Lighthouse was authorized to withdraw the entire amount deposited in the account without regard to whether the funds had been collected. In effect, BB&T agreed to grant unlimited provisional credit to all checks deposited in the account. Thus, Lighthouse would clear the account by drawing a check on the account balance each day.

Vendsouth and BB&T also arranged for a cash management service which allowed the Operating Account to be used as a controlled disbursement account. This service was one of several "treasury services" that BB&T offered its customers. By accessing a computer system at BB&T, Vendsouth was able to determine, no later than 10:00 a.m. each day, the checks that would hit the Operating Account that day. Vendsouth could then communicate with Lighthouse and arrange for Lighthouse to wire transfer sufficient funds into the Operating Account so that all of the checks that would be presented that day would clear. As a result of the operation of the cash management service, any checks drawn on and presented for payment on the Operating Account after this information was provided to Vendsouth, which usually was no later than 10:00 a.m., would not clear until the following day. Thus, any such check drawn on the Operating Account and deposited in the Blocked Account would post on the Operating Account one day after the check was deposited in the Blocked Account and provisional credit had been granted. The result was a one-day float.

In July of 1998, approximately five months after Vendsouth opened the accounts at BB&T, Vendsouth began perpetuating loan fraud against Lighthouse. Such loan fraud involved Vendsouth reporting fictitious sales to Lighthouse in order to receive loan advances from Lighthouse greater than it was legitimately entitled to receive. Vendsouth furthered the fraud by also reporting to Lighthouse fictitious collections of nonexistent receivables. The Blocked Account had been established to receive payments from customers of Vendsouth, i.e., payments on legitimate accounts receivable, and Vendsouth initially used the Block Account for that purpose. However, in July of 1998, Vendsouth began depositing its own checks drawn on the Operating Account into the Blocked Account ("on us" checks). Thereafter, between July 13, 1998, and November of 1999, Vendsouth, on a daily basis, deposited checks into the Blocked Account which were payable to Vendsouth and drawn off the Vendsouth Operating Account. These checks, which greatly exceeded the actual funds in the Operating Account, were not payments on accounts receivable of Vendsouth and were not on their face payments on accounts receivable of Vendsouth. However, BB&T accepted them for deposit into the Blocked

Account and gave immediate provisional credit based upon them. These deposits created the impression that Vendsouth was receiving payments from customers, causing Lighthouse to make advances based on the "deposits". Also, because of the one-day float, Vendsouth was able to obtain the new advances from Lighthouse to "cover" the "on us" checks before the checks posted to the Operating Account. The result was a kiting scheme involving a circular movement of funds in which Vendsouth was "borrowing" funds from BB&T to pay Lighthouse (which occurred when BB&T paid the Lighthouse draws on the Blocked Account), and then borrowing from Lighthouse to repay BB&T (which occurred when Lighthouse wired funds into the Operating Account and those funds were used to cover the "on us" checks that had been deposited into the Blocked Account). This illicit scheme went undetected and continued with the amounts involved increasing as the scheme continued. During the period between July 1998 and November 1999, Vendsouth deposited in excess of 1,250 of these checks into the Blocked Account, aggregating in their total face amount in excess of $ 106,000,000.00. This scheme continued until BB&T caused its collapse on November 9, 1999.

On Friday, November 5, 1999, Vendsouth deposited four "on us" checks, written and drawn on the Operating Account, into the Blocked Account. These were check numbers 10589, 10590, 10591 and 10592, which totaled in the aggregate $ 976,616.13. BB&T granted provisional credit based upon these checks and allowed Lighthouse to withdraw $ 986,431.95 from the Blocked Account pursuant to a check on the Blocked Account that had been issued by Lighthouse on November 4, 1999. Lighthouse then wired $ 895,000.00 into the Operating Account as a new advance to Vendsouth. This advance was used to cover four "on us" checks deposited prior to November 5, 1999, those checks being checks numbered 10584, 10585, 10586 and 10587 in a total amount of $ 899,462.35.

On Monday, November 8, 1999, Vendsouth deposited three "on us" checks, written and drawn on the Operating Account, into the Blocked Account. These were checks numbered 10610, 10611 and 10612, which totaled in the aggregate $ 850,570.17. However, on Monday, November 8, due to an apparent computer malfunction at BB&T, no information regarding which checks would clear the Operating Account that day was available and, therefore, Vendsouth was unable to determine how much money to request Lighthouse to wire into the Operating Account. BB&T informed Vendsouth to hold off and everything would double up on Tuesday, November 9. Thus, on Monday, November 8, 1999, Lighthouse did not make a wire transfer into the Operating Account and no checks cleared the Operating Account.

By the morning of Tuesday, November 9, 1999, Vendsouth had deposited, into the Blocked Account, seven "on us" checks totaling $ 1,827,186.20. These seven checks consisted of the "on us" checks that had been deposited on November 5 and November 8. BB&T had granted provisional credit for all seven checks. BB&T had also decided to stop allowing the deposit of "on us" checks and to end Vendsouth's kiting. But without a wire transfer from Lighthouse into the Operating Account there were insufficient funds available to allow the seven "on us" checks to clear.

On the morning of Tuesday, November 9, BB&T's computer system was again in operation and BB&T furnished to Vendsouth information about the checks that would clear the Operating Account that day. The figure furnished to Vendsouth consisted almost entirely of the $ 1,827,186.20 represented by the seven "on us" checks deposited on Friday, November 5 and Monday, November 8. In response to the information furnished by BB&T, Vendsouth requested Lighthouse to wire $ 1,977,000.00 into the Operating Account on November 9 at approximately 12:30 p.m., which Lighthouse did. Lighthouse then issued a check drawn on the Blocked Account in the amount of $ 1,986,718.08 and deposited it in its account at Bank of America.

BB&T used the $ 1,977,000.00 received from Lighthouse to fund the provisional

credit that had been issued with respect to the seven "on us" checks deposited by Vendsouth on November 5 and 8 in the total amount of $ 1,827,186.20. Pursuant to the decision BB&T had earlier made to end the kite, BB&T refused to accept any further "on us" checks for deposit into the Blocked Account after November 8. Thus, at the end of the day on November 9, 1999, BB&T had no remaining risk from any provisional credit it had granted for "on us" checks and was issuing no further provisional credit for "on us" checks since it no longer was accepting any "on us" checks for deposit into the Blocked Account. On November 12, 1999, the check drawn by Lighthouse on the Blocked Account in the amount of $ 1,986,718.08 was returned "NSF" to Lighthouse.

The check-kiting scheme was effectively terminated through BB&T's actions on November 9 and at that point BB&T retained no risk from the check kite while Lighthouse was now owed a substantial sum of money that it could not collect from Vendsouth's accounts at BB&T.

*Vendsouth, Inc. v. Arth*, No. 00-10112C-7G, 2003 Bankr. LEXIS 1437, at *2-10 (Bankr.M.D.N.C. Oct. 10, 2003).

{5}     Following Judge Stocks' opinion, BB&T and the Trustee in Bankruptcy reached a settlement which provided in part that BB&T would pay funds to the Bankruptcy estate in excess of two million dollars. Lighthouse will receive the vast majority of distributions to creditors in the bankruptcy proceeding.

{6}     On April 2, 2004, plaintiff filed an amended complaint in this Court which seeks claims of relief for breach of contract, declaratory judgment, common law indemnity and contribution. On November 11, 2004, defendant filed an amended answer and counterclaim. Plaintiff seeks relief for counterclaims for breach of contract, common law fraud, unfair and deceptive trade practices, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, unjust enrichment and punitive damages. On January 17, 2005, plaintiff filed a motion to dismiss defendant's counterclaim. On February 4, 2005, defendant filed a motion to dismiss pursuant to Rule 12(b)(6). In addition, on February 4, 2005, defendant filed a motion for leave to file a second amended answer and counterclaim. In defendant's proposed second amended answer and counterclaim, defendant seeks relief for counterclaims for breach of contract, common law fraud, unfair and deceptive trade practices, aiding and abetting fiduciary duty, aiding and abetting fraud, civil conspiracy, constructive fraud, unjust enrichment, constructive trust and punitive damages. Plaintiff opposes defendant's motion for leave to file a second amended answer and counterclaim which adds civil conspiracy, constructive fraud and constructive trust.

{7}     The Court will first address defendant's motion to dismiss. Next, the Court will address plaintiff's motion to dismiss defendant's counterclaim. Lastly, the Court will address defendant's motion for leave to file a second amended answer and counterclaim.

II.

DEFENDANT'S MOTION TO DISMISS

A.

LEGAL STANDARD

{8}     When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted." *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true. *See Hyde v. Abbott Lab., Inc.*, 123 N.C. App. 572, 575, 473 S.E.2d 680, 682 (1996). The court must construe the complaint liberally and

must not dismiss the complaint unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. *See id.* When considering a motion under Rule 12(b)(6), the court is not required to accept as true any conclusions of law or unwarranted deductions of fact in the complaint. *Sutter v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). When the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts which defeat any claim, the complaint should be dismissed under Rule 12(b)(6). *See Hudson Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 511 S.E.2d 309 (1999). When applying this standard, it must be kept in mind that when fraud is alleged, the circumstances constituting fraud must be plead with particularity. N. C. R. Civ. P. 9(b); s*ee also Terry v. Terry*, 302 N.C. 71, 273 S.E.2d 674 (1981). Although the Court has recited the facts from Judge Stocks' opinion in order to put these claims in fuller context, the standard setout above has been applied.

{9}     This case raises difficult issues concerning a bank's responsibilities when it believes check kiting has occurred. There also exists the likelihood that some of Lighthouse's claims and damages alleged in the counterclaim will be significantly reduced when final distribution is made in the bankruptcy proceeding. By way of example only, liability and damages on a claim for unjust enrichment may not exist. Those are issues to be decided at a later date. These are 12(b)(6) motions.

B.

ANALYSIS

*1.     Breach of Contract*

{10}    BB&T's first claim of relief is for breach of contract and is based upon Paragraph 5 of the Blocked Account Agreement. The paragraph states:

> Borrower [Vendsouth] and Lender [Lighthouse] shall indemnify Bank against and hold it harmless from any and all liabilities, claims, costs, expenses, and damages of any nature (including but not limited to allocated costs of staff counsel, other reasonable attorney's fees, and any fees and expenses incurred in enforcing this Agreement) in any way arising out of or relating to disputes or legal actions concerning the Bank's providing of this service, this Agreement, any check (including any fees, claims or suits suffered by Bank arising out of or in connection with its depositing checks payable to or endorsed in favor of Borrower), including any claims by banks participating in loans by Lender to Borrower. This section does not apply to any cost or damage attributable to the willful misconduct of Bank. Lender and Borrower's obligations under this section shall survive termination of this Agreement.

Blocked Account Agreement at ¶ 5.

{11}    BB&T seeks indemnification for costs, expenses and attorney's fees incurred in connection with the Adversary Proceeding as well as continuing costs, expenses and attorney's fees after the final adjudication of the Adversary Proceeding. In addition, BB&T seeks the payment of all liabilities, if any, claims, costs, expenses, and damages incurred by BB&T as a result of the Adversary Proceeding. (Am. Compl. at ¶¶ 18-24.) Lighthouse argues that BB&T is not entitled to indemnification based upon the Blocked Account Agreement and that BB&T's claim for breach of contract fails to state a claim and should be dismissed in its entirety.

{12}    The Court finds factual allegations sufficient to foreclose judgment at this stage. The questions of whether or not the contract is ambiguous or what the scope of the indemnity is meant to cover as well as the question of whether BB&T engaged in willful misconduct are all better suited for summary judgment rather than Rule 12(b)(6). Therefore, Lighthouse's motion to dismiss BB&T's claim for breach of

contract is denied.

*2. Declaratory Judgment*

{13}    BB&T seeks a declaration of its rights under the indemnification clause of the Block Account Agreement. "BB&T seeks a declaration that it has a valid right to indemnification by Lighthouse from all liabilities, claims, costs, expenses and damages, including attorney's fees, incurred or to be incurred in defense of or resulting from the Adversary Proceeding." (Am. Compl. at ¶ 29). Lighthouse argues that BB&T is not entitled to indemnification and therefore BB&T's claim for declaratory judgment should be dismissed.

{14}    The Court finds factual allegations discussed above sufficient to foreclose judgment at this stage. Therefore, Lighthouse's motion to dismiss BB&T's claim for declaratory judgment is denied.

*3. Common Law Indemnity*

{15}    BB&T seeks common law indemnity for any determination of liability and damages on allegations of tort claims in the Adversary Proceeding. BB&T claims that acts and omissions of Lighthouse proximately caused or contributed to the injury and damages alleged by the Trustee for Vendsouth. Lighthouse seeks dismissal of this claim due to the existence of an express indemnity clause in the Blocked Account Agreement. In addition, Lighthouse argues that BB&T has no right to indemnification due to BB&T's alleged intentional torts.

{16}    BB&T seeks common law indemnity as an alternative basis for relief. Pursuant to Rule 8(a)(2) of the North Carolina Rules of Civil Procedure, alternative claims for relief are permitted. At this stage in the proceedings, dismissal of properly pled claims in the alternative is unwarranted. The proper stage of the proceedings to consider this issue is at the summary judgment stage. Therefore, Lighthouse's motion to dismiss BB&T's claim for common law indemnity is denied.

*4. Contribution*

{17}    To the extent that BB&T is found liable to Vendsouth in the Adversary Proceeding, BB&T seeks contribution from any parties whose acts or omissions contributed to such liability. BB&T claims entitlement to contribution against such other tortfeasors, including Lighthouse, for their pro rata share of any award in favor of Vendsouth and against BB&T. (Am. Compl. ¶¶ 36-38.) Lighthouse argues that contribution is precluded by the express indemnity provision in the Blocked Account Agreement. Further, Lighthouse opposes the claim for contribution due to BB&T's alleged intentional torts.

{18}    BB&T seeks contribution as an alternative basis for relief. Pursuant to Rule 8(a)(2) of the North Carolina Rules of Civil Procedure, alternative claims for relief are permitted. At this stage in the proceedings, dismissal of properly pled claims in the alternative is unwarranted. The proper stage of the proceedings to consider this issue is at the summary judgment stage. Therefore, Lighthouse's motion to dismiss BB&T's claim for contribution is denied.

III.

PLAINTIFF'S MOTION TO DISMISS THE COUNTERCLAIM

A.

LEGAL STANDARD

{19}    The standards for dismissal of a counterclaim are the same as the standards that govern the dismissal of a complaint. In addition to the standards set forth above in Part II.A, a claim should be dismissed when the existence of a meritorious affirmative defense, such as the statute of limitations, appears on the face of the counterclaim. *See Forsyth Memorial Hospital, Inc. v. Armstrong World*

*Industries, Inc.*, 336 N.C. 438, 444 S.E.2d 423 (1994).

B.

ANALYSIS

*1.      Breach of Contract*

{20}      Pursuant to North Carolina General Statute Section 1-52(a), a claim for breach of contract is subject to a three-year statute of limitations.  The counterclaim was filed by Lighthouse on November 12, 2004.  The alleged act or acts that Lighthouse contends give rise to its claim for breach of contract are alleged to have occurred on or before November 8, 1999.  Therefore, the counterclaim for breach of contract is time barred by the statute of limitations and BB&T's motion to dismiss the counterclaim for breach of contract is granted.

*2.      Fraud*

{21}      Pursuant to North Carolina General Statute Section 1-52(9), a claim for fraud is subject to a three-year statute of limitations.  A cause of action for fraud accrues upon the discovery of the facts constituting the fraud.  Discovery of fraud as used in the statute means actual discovery or the time when fraud should have been discovered.  *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 485, 593 S.E.2d 595, 601 (2004) (citing *Calhoun v. Calhoun*, 18 N.C. App. 429, 197 S.E.2d 83 (1973).

{22}      Issues of fact regarding when Lighthouse became aware of certain facts and their relevancy preclude judgment on the pleadings at this time.  Therefore, BB&T's motion to dismiss the counterclaim for fraud is denied.

*3.      Unfair and Deceptive Trade Practices*

{23}      When a claim for unfair and deceptive trade practices is based upon fraud, the limitations period begins to run when the plaintiff discovers or should have discovered the fraud.  *Nash v. Motorola*, 96 N.C. App. 329, 331, 385 S.E.2d 537, 538 (1989), *review allowed*, 326 N.C. 483, 392 S.E.2d 94, *aff'd*, 328 N.C. 267, 400 S.E.2d 36 (1990).  The same issues of fact discussed above preclude judgment at this stage in the proceedings on the claim for fraud.  Therefore, the claim for unfair and deceptive trade practices which is based upon the alleged fraud cannot be dismissed.  BB&T's motion to dismiss the counterclaim for unfair and deceptive trade practices is denied.

*4.      Aiding and Abetting Breach of Fiduciary Duty*

{24}      A claim for aiding and abetting breach of fiduciary duty is governed by the three-year statute of limitations of North Carolina General Statute Section 1-52.  Where a claim is essentially grounded in contract, the three-year statute of limitations applies.  *See Tyson v. North Carolina National Bank*, 305 N.C. 136, 141, 286 S.E.2d 561, 565 (1982).  However, a ten-year statute of limitations governs a claim for aiding and abetting breach of fiduciary duty which arises from constructive fraud.  *See NationsBank of North Carolina, N.A. v. Parker*, 140 N.C. App. 106, 535 S.E.2d 597 (2000).  In this case, Lighthouse alleges fraud and constructive fraud arising from BB&T's alleged acts and omissions in shifting the loss caused by Vendsouth's fraud to Lighthouse.  Sufficient allegations of fact preclude judgment at this stage in the proceedings on the claim for fraud and constructive fraud.  The claim for aiding and abetting breach of fiduciary duty arises from the alleged constructive fraud.  Thus, sufficient allegations of fact preclude judgment at this stage in the proceedings on the claim for aiding and abetting breach of fiduciary duty.  Therefore, to the extent that North Carolina recognizes a cause of action for aiding and abetting breach of fiduciary duty, BB&T's motion to dismiss the counterclaim for aiding and abetting breach of fiduciary duty is denied.

5.      *Aiding and Abetting Fraud*

{25}    No North Carolina state court has recognized a claim for aiding and abetting fraud.[2]  Recently, this Court addressed this issue and held that North Carolina courts should not recognize a claim for aiding and abetting fraud.  The Court reasoned,

> This Court cannot distinguish [] [a] claim [for aiding and abetting fraud] from a direct fraud claim.  There must be direct knowledge and intent to defraud.  If that is required, the claims are redundant.  Why would it be prudent to engraft the requirements of knowledge and intent on an aiding and abetting fraud claim under these circumstances?  Unintended consequences will result from the elimination of those requirements.  If professionals such as accountants and lawyers could be held liable for fraud when their clients used their services to defraud a third party without the professionals' intent to participate in the fraud, the costs of such services would be prohibitive to all but the affluent.  Such professionals would either have to incur the expense of investigation into how their services were being used or be placed in the position of insurers of their clients' honesty.  Either burden would add an unacceptable cost to the provision of necessary and desirable services.  Also, it seems illogical to impose liability for aiding and abetting fraud based upon a lower level of scienter than fraud itself.  Nor would it be consistent with the cases in which the North Carolina courts have based joint liability on comparable culpability.  Without knowledge and similar intent, there can be no joint effort or concert in action.

*Sompo Japan Ins. Inc. v. Deloitte & Touche,* LLP, 2005 NCBC 2, at ¶ 10 (No. 03CVS5547, Guilford County Super. Ct. June 10, 2005)(Tennille, J.).  Therefore, BB&T's motion to dismiss the counterclaim for aiding and abetting fraud is granted.

6.      *Unjust Enrichment*

{26}    A claim for unjust enrichment is governed by the three-year statute of limitation of North Carolina General Statute Section 1-52.  Where a claim is essentially grounded in contract, the three-year statute of limitations applies.  *See Tyson v. North Carolina National Bank*, 305 N.C. 136, 141, 286 S.E.2d 561, 565 (1982).  However, a ten-year statute of limitations governs a claim for unjust enrichment pleaded on the basis of constructive fraud.  *See Adams v. Moore*, 96 N.C. App. 359, 385 S.E.2d 799 (1989), *rev. den.*, 326 N.C. 46, 389 S.E.2d 83 (1990).  In this case, Lighthouse alleges fraud and constructive fraud arising from BB&T's alleged acts and omissions in shifting the loss caused by Vendsouth's fraud to Lighthouse.  Sufficient allegations of fact preclude judgment at this stage in the proceedings on the claim for fraud and constructive fraud.  The claim for unjust enrichment arises from the alleged constructive fraud.  Thus, issues of fact preclude judgment at this stage in the proceedings on the claim for unjust enrichment.  Therefore, BB&T's motion to dismiss the counterclaim for unjust enrichment is denied.

7.      *Punitive Damages*

{27}    Punitive damages may be sought for fraud.  N.C. Gen. Stat. § 1D-15(a).  Here, defendant counterclaims for fraud.  There are sufficient allegations to preclude judgment on defendant's counterclaim for fraud at this stage in the proceedings.  Therefore, BB&T's motion to dismiss the counterclaim for punitive damages is denied.

IV.

MOTION TO AMEND

A.

LEGAL STANDARD

{28}    Pursuant to North Carolina Rules of Civil Procedure Rule 15, the Court may grant leave to file an amended pleading.  The rule states:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 30 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within 30 days after service of the amended pleading, unless the court otherwise orders.

N.C. R. Civ. P. 15(a). Thus, the Court is free to allow defendant leave to amend its answer when justice so requires.

## B.

## ANALYSIS

{29} Defendant's motion for leave to file a second amended answer is allowed in part and denied in part. The additional factual allegations are permitted. The new counterclaims for civil conspiracy and constructive fraud are allowed subject to the findings of the original fraud claim.

{30} The North Carolina Court of Appeals has recently addressed the question of the adequacy of pleadings alleging "constructive fraud." *See Toomer v. Branch Banking and Trust Company*, No. COA04-599, 2005 N.C. App. LEXIS 1188 (June 21, 2005). In that case there were no allegations of fraud, only breach of fiduciary duty. The Court of Appeals held: "Noticably absent is the required assertion that UCB sought to benefit itself. Indeed, plaintiffs' complaint characterizes UCB's behavior as 'erroneous.' Accordingly, plaintiffs have not asserted claims for constructive fraud." *Toomer*, 2005 N.C. App. LEXIS 1188, at *18-19.

{31} The Court of Appeals so held even though the "errors" allegedly significantly increased the trustee funds.

{32} In this case, defendant has alleged fraud by BB&T and specifically alleged that the fraudulent acts were taken to benefit BB&T to the detriment of defendant. (Am. Answer and Countercl. at 13, 16.) There are sufficient allegations to preclude judgment on these claims at this stage in the proceedings.

{33} Defendant seeks the imposition of a constructive trust as alternative claim for relief. "A constructive trust arises when one obtains legal title to property in violation of a duty owed to another." *United Carolina Bank v. Brogan*, 155 N.C. App. 633, 635-36, 574 S.E.2d 112, 114-15 (2002) (citations omitted). Ordinarily, constructive trusts "arise from actual or presumptive fraud and usually involve the breach of a confidential relationship." *Id.* at 635, 574 S.E.2d at 114. Constructive trusts are "imposed by courts of equity to prevent the unjust enrichment or the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." *Id.* at 636, 574 S.E.2d at 115. Where adequate remedies at law exist to pursue claims of fraud, the equitable remedy of a constructive trust is unwarranted. *Old Line Life Ins. Co. v. Bollinger*, 161 N.C. App. 734, 738, 589 S.E.2d 411, 413 (2003).

{34} Lighthouse seeks a constructive trust based on BB&T's alleged acts or omissions of misconduct including fraud, civil conspiracy with the officers and directors of Vendsouth and the aiding and abetting of the fraud on Lighthouse. (Def.'s Second Am. Answer at ¶ 59.) Adequate remedies at law exist for the claims for which Lighthouse seeks imposition of a constructive trust. Therefore, the motion for leave to file an amended answer to assert a counterclaim for constructive trust is denied.

## CONCLUSION

{35}   Based upon the foregoing, it is hereby Ordered, Adjudged, and Decreed:

1.   Defendant's motion to dismiss pursuant to Rule 12(b)(6) is DENIED.

2.   Plaintiff's motion to dismiss the counterclaim for breach of contract is GRANTED.

3.   Plaintiff's motion to dismiss the counterclaim for fraud is DENIED.

4.   Plaintiff's motion to dismiss the counterclaim for unfair and deceptive trade practices is DENIED.

5.   Plaintiff's motion to dismiss the counterclaim for aiding and abetting fiduciary duty is DENIED.

6.   Plaintiff's motion to dismiss the counterclaim for aiding and abetting fraud is GRANTED.

7.   Plaintiff's motion to dismiss the counterclaim for unjust enrichment is DENIED.

8.   Plaintiff's motion to dismiss the counterclaim for punitive damages in DENIED.

9.   Plaintiff's motion for leave to file a second amended answer and counterclaim is GRANTED with respect to the additional factual allegations and the additional counterclaims for civil conspiracy and constructive fraud.

10.   Plaintiff's motion for leave to file a second amended answer and counterclaim is DENIED with respect to the additional counterclaim for constructive trust.

{36}   The parties shall jointly report to the Court any distribution to Lighthouse from the Vendsouth bankruptcy estate.

SO ORDERED, this the 13th day of July 2005.

---

[1] Lighthouse was not a party to the Adversary Proceeding but, as Vendsourth's largest creditor, funded the Trustee's legal fees.

[2] In the Adversary Proceeding Judge Stocks ruled that he thought the state courts would recognize aiding and abetting fraud. For the reasons set forth below, this Court believes his reliance on *Blow v. Shaughnessy*, 88 N.C. App. 484, 364 S.E.2d 444 (1988) was misplaced.